633 S.E.2d 762

**In the Matter of: RENEWED INVESTI-GATION OF THE STATE POLICE CRIME LABORATORY, SEROLOGY DIVISION.**

No. 32885.

Supreme Court of Appeals of
West Virginia.

Submitted: May 10, 2006.

Decided: June 16, 2006.

George Castelle, Esq., Public Defender Corporation, Charleston, for Prisoners.

Philip W. Morrison, II, Esq., Special Prosecutor, South Charleston, for the State.

MAYNARD, Justice.

This case concerns a third investigation of the Serology Division of the State Police Crime Laboratory ("Crime Lab"). The specific issue in this case is whether serologists in the Crime Lab, other than Fred Zain, falsified evidence in criminal prosecutions.[1] This Court earlier appointed a special judge to conduct an investigation and to render a report. We now adopt the special judge's report to the extent that it finds insufficient evidence of intentional misconduct by Zain's assistant serologists to warrant invalidation of serology evidence and a systematic review of those cases in which serology evidence was offered. However, because of the frequent and recurring errors identified in the work of Zain's assistant serologists, we deem it necessary to enact a special habeas corpus procedure, outlined below, to be utilized by those prisoners against whom serologists, other than Zain, offered evidence.

1. According to the prisoners' brief filed with this Court, the serology era ended in the early 1990's when conventional serology testing was replaced by DNA testing.

## I.

### FACTS

A brief history of recent investigations involving the Serology Division of the State Police Crime Lab is as follows. In 1993, this Court appointed a special judge to supervise an investigation into allegations that Fred Zain[2], a serologist in the State Police Crime Lab, gave false testimony in criminal prosecutions. In his report to this Court, the special judge found that Zain intentionally and systematically gave inaccurate, invalid, or false testimony or reports. The special judge concluded that Zain's misconduct was so egregious that it should be considered newly discovered evidence in any criminal prosecutions in which Zain offered evidence. In *Matter of W.Va. State Police Crime Lab. ("Zain I")*, 190 W.Va. 321, 438 S.E.2d 501 (1993), this Court adopted the special judge's recommendation that,

as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding. The only issue in any habeas corpus proceeding would be whether the evidence presented at or prior to trial or prior to the entry of a guilty plea, independent of the forensic evidence presented by Zain, would have been sufficient to support the verdict or plea.

*Zain I*, 190 W.Va. at 340, 438 S.E.2d at 520.

About a year later, in *Matter of W.Va. State Police Crime Lab. ("Zain II")*, 191 W.Va. 224, 445 S.E.2d 165 (1994), this Court confronted the issue of whether serologists employed by the Crime Lab, other than Zain, falsified evidence in criminal prosecutions. An investigation was conducted into the work and testimony of these other serologists at the Crime Lab to determine whether any of them committed acts similar to Zain's. The special judge who supervised the inquiry and

2. Fred Zain worked as a chemist for the West Virginia State Police from 1979 until 1989.

reviewed the findings of the investigation found some evidence of occasional relatively minor errors, but concluded that these errors did not significantly compromise the criminal prosecutions in which the serologists offered evidence. In light of these findings, the special judge recommended that the investigation be closed. This Court adopted the special judge's findings. In Syllabus Point 3 of *Zain II*, we held:

> Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

In 1999, additional allegations arose that a State Trooper knowingly falsely testified about nonexistent serology test results supposedly linking a petitioner in a habeas corpus claim to the crime at issue. As a result, then Chief Justice Starcher entered an administrative order, dated June 10, 1999, in which he directed the Honorable James O. Holliday, a retired circuit court judge: [3]

> (1) to appoint ... an independent forensics expert to conduct a thorough review of the policies, procedures, and records of the [State Police Serology Lab]; (2) to appoint, if he deems necessary and proper, a special prosecutor to serve as representative of the State of West Virginia in any proceedings arising from this appointment; (3) to appoint, if he deems necessary and proper, a public defender to serve as representative of prisoners whose convictions were obtained, in part, through evidence secured from the [State Police Serology Lab]; (4) to conduct such proceedings as he may deem necessary and proper in furtherance of the investigation; (5) if it is concluded that nonexistent serology testing was reported, to investigate why the [1994 forensics report] did not identify this matter; and (6) to render a written report

to [this Court] containing findings of fact, conclusions of law and recommendations regarding actions to be taken in light of the results of the investigation.

Judge Holliday subsequently appointed Kanawha County Public Defender George Castelle as counsel for possible affected prisoners and William Charnock as counsel for the State.[4] Ten cases were identified for review that involved the tests and trial testimony of serologists other than Zain. Of these ten cases, two involved tests and trial testimony of Zain's assistants while Zain was their supervisor. Mark Stolorow, Executive Director of Orchid Cellmark Laboratories, was appointed to review the selected cases. Following Mr. Stolorow's examination, his initial conclusions were forwarded to Ronald Linhart, an inspector with the American Society of Crime Laboratory Directors and one of the independent experts in the original Zain investigation, to review Stolorow's proposed draft. Both scientists then filed a joint report on December 2, 2004 ("Stolorow/Linhart report").[5]

In a portion of the report that included Stolorow's individual analysis of the investigation results, he found "a significant number of errors in many categories, including documentation omissions, conflicts and unreported genetic typing results." In his comparison of these findings with those of the earlier investigations of the Crime Lab, Stolorow opined that "[t]he problems noted [in the current report] vary in degree of seriousness and frequency, but collectively are not as egregious as those committed by Zain." He further found, however that "[i]t would appear that the extent of the errors noted in the present review is substantially greater than that observed by the ... investigators in [*Zain II* ]." In addition, Stolorow indicated that "there was no discovery of evidence that exculpated an otherwise inculpated defendant." Finally, he concluded that "[t]here are no smoking guns as witnessed with the intentional and egregious misconduct of Fred

---

**3.** Judge Holliday was the special judge in both *Zain I* and *Zain II*.

**4.** William Charnock was later succeeded by Philip W. Morrison, II.

**5.** Both the prisoners and the State agreed that evidentiary hearings were not required in this matter.

Zain, at least in these 10 cases under investigation."

In his review of Stolorow's analysis, Linhart disputes Stolorow's characterization of particular Crime Lab results as "fabrication," and also disagrees with Mr. Stolorow's criticism of a serologist's testimony in a specific prosecution.[6] Linhart then concludes that "after reviewing the defects described by Mr. Stolorow in the cases herein reported, I still do not conclude that there is evidence of misconduct as we defined it."

In the "Conclusions and Recommendations" portion of the report, Stolorow and Linhart jointly concluded as follows:

The errors found by this investigation were frequent, recurring and multifaceted, spanning the spectrum of examiners. However, it must be stressed that in only one instance does it appear that erroneous procedures, documentation, reporting or testimony led to a false, but non-probative, association between a defendant and the biological evidence (*State v. Gray and Finney*) .... The authors of this report do not ascribe any particular motive, intent or design to the scientists in regard to the errors made ...

Finally, there is a significant qualitative difference between the errors discovered during this investigative review and the shocking and egregious misconduct documented in *Zain I*. The intentional and willful malfeasance and reckless disregard of both the truth and good scientific practice exhibited by Fred Zain were not found to exist in these cases among the remaining serologists in the laboratory.

Having made those comments as to our findings, however, the seriousness of these errors should not be understated. They represent a divergence from good science and on occasion ethical conduct, and raise a strong inference that the problems were systemic in the Serology Division. The interpretation, statements of strength and frequency, and reporting errors found collectively in the reviewed cases have diverse impact on the individual cases. Consider-

ation may be given to the determination that the work product of the serologists other than Fred Zain during the relevant period that these cases were tested is generally regarded as potentially unreliable. The analysis of the underlying serological data in each of the cases examined, however, shows that the results of the tests actually conducted in the reviewed cases, except where noted, appear to be substantially correct....

After considering the proposed findings of fact and conclusions of law of both the prisoners and the State, the Honorable Thomas A. Bedell, who succeeded Judge Holliday as special judge, filed his September 23, 2005, report in which he concluded that "there is not a scintilla of evidence of intentional misconduct on the part of the serologists who worked with Fred S. Zain.... Although there were some errors identified in cases reviewed, the Stolorow/Linhart report concluded that the errors were non-probative in the cases in which they were found." Because Judge Bedell found no pattern or practice of intentional misconduct and that the false evidence had no material effect on the jury verdicts, he concluded that a systematic review of those cases in which persons were convicted upon the evidence of the serologists, other than Zain, and invalidation of the evidence, as set forth in *Zain I*, are not warranted.

Thereafter, the prisoners submitted to this Court their objections to Judge Bedell's report in which they vehemently disagree with his finding that there is no evidence of intentional misconduct on the part of other employees of the Crime Lab. The prisoners offered their own proposed conclusions of law as well as proposed recommendations. The State responded to the prisoners' objections and urged this Court to adopt the findings of the special judge.

## II.

## DISCUSSION

The prisoners essentially allege clear error in the special judge's conclusion that there is

---

**6.** Specifically, Stolorow describes in his report what he considers to be the contradictory nature of Trooper Smith's testimony in the case of *State*

*v. Farmer* in regards to the reliability of Fred Zain's finding of all eight genetic markers in all items of evidence.

no evidence of intentional misconduct on the part of serologists other than Zain. According to the prisoners, Stolorow's findings are replete with examples of intentional misconduct including repeated instances of reporting and testifying to nonexistent serology testing; false portrayal of male population frequencies which Stolorow characterized as "a hoax that was perpetrated on West Virginia juries during this period in history not only by Fred Zain but also by Troopers Ted Smith and H.B. Myers;" the repeated overstatement of laboratory results in favor of the prosecution; and the contradictory testimony of Trooper Smith in the *Farmer* case.[7] In addition, it is the prisoners' position that a finding that the errors were non-probative does not validate the work of the serologists because there is no means of knowing what the test results would have shown if all the tests that were reported had actually been conducted. Finally, the prisoners assert that whether or not the errors in the lab reports and testimony were intentional, the evidence presented in court fails to meet the reliability requirements of both *Frye v. U.S.*, 293 F. 1013 (D.C.Cir.1923), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and should be deemed inadmissible.[8]

The State, on the other hand, agrees with the special judge's conclusion that there is no evidence that serologists, other than Zain, committed intentional misconduct and points to Stolorow and Linhart's finding that "the intentional and willful malfeasance and reckless disregard of both truth and good scientific practice exhibited by Fred Zain were not found to exist in these cases." Thus, concludes the State, the special judge properly declined to invalidate the work in question

and recommend a systematic review of cases in which serology evidence was offered.

■ After careful review of the Stolorow/Linhart findings, the special judge's report, and the briefs of the prisoners and the State, this Court concludes that there is insufficient evidence of intentional misconduct to justify invalidating the work of serologists other than Zain. In *Zain I*, this Court decided that Zain's work warranted a presumption of invalidity and a systematic review of cases in which serology evidence was offered due in large part to the finding that Zain engaged in a regular practice of falsifying or misrepresenting scientific results in his testimony. In contrast, no finding was made in the instant case that serologists other than Zain engaged in such intentional misconduct.

For example, in his comparison of the extent of Crime Lab deficiencies in *Zain I* and the instant case, Stolorow found that "[t]he problems noted [in the instant investigation] vary in degree of seriousness and frequency, but collectively are not as egregious as those committed by Zain." He further indicated that "[t]here are no smoking guns as witnessed with the intentional and egregious misconduct of Fred Zain, at least in these 10 cases under investigation."

Significantly, in those instances where Stolorow stridently criticized the Crime Lab's work, Linhart often disagreed with Stolorow. As noted above, in response to Stolorow's characterization of the Crime Lab employees' reporting of specific test results as "fabrication," Linhart indicates that "it seems inappropriate to characterize this as fabrication of results." Linhart further disputed Stolorow's criticism of Trooper Myers' testimony in the *Farmer* case. Again, after reviewing

---

7. *See* fn. 6 *supra.*

8. The prisoners also urge this Court to unseal records of investigations that have been conducted of Crime Lab divisions other than the Serology Division which are not the subject of the instant proceedings. In the alternative, the prisoners request that this Court conduct a *de novo* review of these records to determine their relevancy to the instant investigation. We note that these records were reviewed *in camera* by the special judge, and he concluded that they were not relevant to the issues before the court. The prisoners now contend that because their coun-

sel was not permitted to review these records, it is not possible to know if the special judge's ruling concerning the relevancy of the records is in error.

The State objects to unsealing the records in light of the fact that the special judge found these records to be irrelevant to the instant renewed investigation of the Serology Division, and because the prisoners cannot present compelling evidence to the contrary. We agree with the State on this matter and decline to grant the prisoners' request.

the defects described by Stolorow in the ten cases examined by him, Linhart concluded that "I still do not conclude that there is evidence of misconduct as we defined it."

Finally, Stolorow and Linhart both failed to ascribe any particular motive, intent or design to the Crime Lab employees in regard to the errors they made, noting that the errors could have been caused by a wide variety of factors. In their joint conclusion and recommendation, they recognized "a significant qualitative difference between the errors discovered during this investigative review and the shocking and egregious misconduct documented in *Zain I*," and expressed the opinion that "[t]he intentional and willful malfeasance and reckless disregard of both the truth and good scientific practice exhibited by Fred Zain were not found to exist in these cases among the remaining serologists in the laboratory." Further, after noting the significant flaws found in the Crime Lab's work, Stolorow and Linhart concluded that "[t]he analysis of the underlying serological data in each of the cases examined, however, shows that the results of the tests actually conducted in the reviewed cases, except where noted, appear to be substantially correct."

■ An additional reason for this Court to reject a presumption of invalidity of the Crime Lab's work and a systematic review of the prisoners' cases is the complete lack of evidence that inaccurate serology evidence affected the outcome of any trial reviewed below. In Syllabus Point 2 of *Zain I*, we held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict." In *Zain II*, an important factor in our decision not to award a presumption of invalidity and a systematic review of the cases was the special judge's conclusion that "there is no indication that the occasional errors of relative insignificance committed by these officers affected, to any discernible degree, the prosecutions of the cases in which they gave evidence." 191 W.Va. at 227, 445 S.E.2d at 168.

Significantly, in this case, Stolorow and Linhart jointly concluded that,

> it must be stressed that in only one instance does it appear that erroneous procedures, documentation, reporting or testimony led to a false, but non-probative, association between a defendant and the biological evidence .... In three cases, it appears that erroneous procedures, documentation, reporting or testimony led to the false, but non-probative, association between a victim and the biological evidence[.]

The finding that inaccurate serology evidence did not affect the outcome of the prosecutions reviewed indicates a lack of evidence that the most important element in the setting aside of a conviction is present in this case. Accordingly, because Stolorow and Linhart did not find the type of systematic and intentional misconduct discovered in *Zain I*, and because there is no evidence that serology evidence affected the prosecutions of any of the cases investigated, we adopt the special judge's report to the extent that it recommends that the evidence offered by serologists, other than Zain, is not subject to invalidation and systematic review of those cases in which serology evidence was presented. Therefore, this Court holds, as we did in *Zain II*, that,

> Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

Syllabus Point 3, *Matter of W.Va. State Police Crime Lab.*, 191 W.Va. 224, 445 S.E.2d 165 (1994).

■ This, however, does not end our consideration of the issue before us. As this Court noted in *Zain II*, and as Judge Bedell indicated in his report to this Court, the determination that the serology evidence at issue is not subject to the invalidation strictures and systematic review authorized in *Zain I* does not preclude prisoners against whom these serologists offered evidence from

seeking habeas corpus relief under our Post-Conviction Habeas Corpus statute, W.Va. Code § 53–4A–1, *et seq.* In such a proceeding, a prisoner who challenges his or her conviction must prove that the serologist offered false evidence in his or her prosecution. Also, the prisoner must satisfy the following standards indicating that a new trial is warranted:

> A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that [defendant] was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. Syllabus Point 1, *Halstead v. Horton,* 38 W.Va. 727, 18 S.E. 953 (1894).

Syllabus, *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979).

In addition, because of the significant number, frequency, and types of errors which Stolorow discovered in the work of the Crime Lab serologists, this Court finds it necessary to enact additional safeguards to ensure that prisoners against whom serologists offered evidence receive a thorough, timely, and full review of their challenges to the serology evidence. To this end, we direct the following.[9]

■ First, a prisoner against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence and who challenges his or her conviction based on the serology evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence. The prisoner is to be represented by counsel unless he or she knowingly and intelligently waives that right. The circuit court is to review the serology evidence presented by the prisoner with searching and painstaking scrutiny. At the close of the evidence, the circuit court is to draft a comprehensive order which includes detailed findings as to the truth or falsity of the serology evidence and if the evidence is found to be false, whether the prisoner has shown the necessity of a new trial based on the five factors set forth in the syllabus of *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979).

■ Second, a circuit court that receives a petition for a writ of habeas corpus from a prisoner against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence, and whose request for relief is grounded on the serology evidence, is to hear the prisoner's challenge in as timely a manner as is reasonably possible.

Third, this Court suspends to a limited degree the rules of *res judicata* that generally apply to a petition for a writ of habeas corpus subjiciendum. According to W.Va. Code § 53–4A–1 (1967), a prisoner may file a petition for a writ of habeas corpus, *inter alia,*

> if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated . . . in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to se-

---

9. This Court's power to fashion special relief in habeas corpus for prisoners who may have been affected by false serology evidence is found in the rule-making clause of Article VIII, § 3 of the West Virginia Constitution as well as our general supervisory control over circuit courts, also found in Article VIII, § 3.

**416**

cure relief from such conviction or sentence.

The statute goes on to explain in subpart (b),

For the purposes of this article, a contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been previously and finally adjudicated only when at some point in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, there was a decision on the merits thereof after a full and fair hearing thereon and the time for the taking of an appeal with respect to such decision has not expired or has expired, as the case may be, or the right of appeal with respect to such decision has been exhausted, unless said decision upon the merits is clearly wrong.

In order to guarantee that the serology evidence offered in each prisoner's prosecution will be subject to searching and painstaking scrutiny, this Court now holds that a prisoner who was convicted between 1979 and 1999 [10] and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evi-

10. Of course, a prisoner who was convicted outside of these dates and who alleges that inaccurate serology evidence was offered at his or her trial may still bring a regular habeas corpus claim.

11. During his oral argument before this Court, counsel for the prisoners asserted that individual habeas corpus proceedings are inadequate to address the deficiencies discovered by the Stolorow/Linhart report because the relevant serology records are now incomplete or nonexistent. Thus, concludes counsel, the prisoners require a presumption of the invalidity of serology evidence in seeking their relief. Although this Court is sympathetic to counsel's concern, for the reasons stated above, we do not believe that a presumption of invalidity is warranted. We note, however, that in instances where challenged evidence is no longer available, the circuit court is charged with using its discretion to fash-

dence, and the challenge was finally adjudicated.[11]

As a final matter, this Court wishes to commend Judge Holliday whom this Court originally appointed to conduct this renewed investigation of the Crime Lab. We further wish to thank Judge Bedell, who succeeded Judge Holliday as special judge, for the quality of his work in conducting the investigation and in the report submitted to this Court. We also wish to recognize the able assistance given to the special judges by George Castelle, the Kanawha County Public Defender, counsel for the prisoners; William Charnock, who was originally appointed by Judge Holliday as counsel for the State; and Philip W. Morrison, II, who succeeded Mr. Charnock as counsel for the State.

### III.

### CONCLUSION

In sum, we adopt the special judge's report to the extent that it recommends that the evidence offered by serologists, other than Fred Zain, is not subject to the invalidation strictures and the systematic review of those cases in which these serologists offered evidence. We modify the special judge's report to the extent that we enact a special habeas corpus procedure whereby prisoners against whom evidence was offered by serologists, other than Zain, can receive a thorough, timely, and full review of their challenges to the serology evidence.[12]

ion a fair and equitable remedy taking into consideration the remainder of the evidence upon which the prisoner was convicted.

12. In addition to invalidation of the evidence of serologists, other than Zain, and a systematic review of those cases in which these serologists offered evidence, the prisoners also recommended to this Court that the State Police Crime Lab should be removed from State Police supervision and placed under the supervision of an independent agency; in the event the Crime Lab is not removed from State Police supervision, the Crime Lab should have an independent supervisory board consisting of scientists, judges, prosecutors, and defense lawyers; police, prosecutors, and crime lab personnel should receive regular training on the requirement of disclosure of evidence favorable to the defense; and the State should establish a standing commission to review cases of wrongful convictions, identify their

Findings of Special Judge Adopted as Modified

causes, and make recommendations for changes in the criminal justice system to help ensure that wrongful convictions are less likely to recur in the future.

While this Court considers these matters to be beyond its purview, we believe that removing the Crime Lab from State Police supervision and placing it under an independent agency as well as the creation of an independent supervisory board to oversee and advise the work of the Crime Lab deserve further consideration by the appropriate authorities.